[Cite as *State v. D.F.*, 2017-Ohio-2882.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   27032 |
| | : | |
| v. | : | T.C. NO. 14CR2059/3 |
| | : | |
| D.F. | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___19th___ day of _____May_____, 2017.

. . . . . . . . . .

LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

FRANCISCO E. LUTTECKE, Atty. Reg. No. 0082866 and CHARLYN BOHLAND, Atty. Reg. No. 0088080, Assistant State Public Defenders, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

        **{¶ 1}** D.F., a minor, was found guilty after a bench trial in the Montgomery County

Court of Common Pleas, General Division, of aggravated assault, an inferior offense of

felonious assault, and voluntary manslaughter, an inferior offense of murder. The trial court merged the two charges and sentenced D.F. to a mandatory term of eleven years in prison for voluntary manslaughter. D.F. was 16 years old at the time of the offenses.

{¶ 2} D.F. raises five assignments on appeal. He claims that (1) the trial court erred in using a prior juvenile adjudication to impose a mandatory prison term, (2) the trial court erred in failing to suppress statements that he made to the police; (3) the trial court erred in imposing a maximum sentence, (4) the trial court erred in failing to sentence him in accordance with R.C. 2152.121, and (5) the juvenile court abused its discretion in finding that he was not amenable to treatment in the juvenile system.

{¶ 3} As discussed below, we need not address D.F.'s specific assignments of error in light of the Ohio Supreme Court's ruling in *State v. Aalim*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-8278 and our case law interpreting R.C. 2152.12(I). The trial court's judgment will be reversed, and the matter will be remanded to the juvenile court for further proceedings.

## I. Background and Procedural History

{¶ 4} In its verdict following the bench trial, the trial court found the following facts.

{¶ 5} In the early morning hours of June 8, 2014, 35-year-old Ryan Adams approached D.F.'s mother and D.F.'s fifteen-year-old sister as they stood outside their home in Dayton. Adams stated to them that "everybody needs a playmate, do you want to play with me?" or similar sexually-suggestive words. D.F.'s mother and sister indicated they did not, and Adams walked some distance away, but stopped, turned around with his arms folded, and stared at them. D.F.'s mother and sister became "worried and anxious," and the sister proceeded to call D.F. (her sixteen-year-old brother),

Harley Farrell (the boyfriend of her maternal aunt),[1] or both, requesting that D.F. and Farrell return to the area. (D.F., Farrell, and the aunt had walked down the street to see some "commotion" that was occurring there.)

{¶ 6} D.F. and Farrell arrived separately but at approximately the same time, and D.F. began questioning his mother and sister regarding the nature of their concern. Upon learning that Adams had made his suggestive remarks and had yet to leave the neighborhood, D.F. became "angry and furious," and he and Farrell attempted to locate Adams. D.F. and Farrell found Adams nearby, and Adams returned voluntarily with D.F. and Farrell to D.F.'s home. When D.F.'s sister confirmed that "he was the guy" who had made the sexually-suggestive remarks, D.F. became even more enraged and furious, and he demanded that Adams leave the neighborhood and never disrespect his family again.

{¶ 7} Adams "did not take kindly" to D.F.'s demands. Rather, Adams pulled off his shirt and challenged D.F., a "much younger and smaller" individual, to a fight; Adams called D.F. a "punk" and spewed a stream of profanity and epithets. D.F. and Adams, "in mutual combat, squared off in the street." Ultimately, D.F. struck Adams several times in the face, dropping Adams to his buttocks on the grass next to the street. Adams was down only momentarily and regained his feet. Then, after the two combatants "exchanged further epithets and other unpleasantries," Adams did not re-engage D.F., but instead turned and walked away from D.F., ending the "mutual combat." (The trial court expressly rejected, as not credible, testimony that Adams did not walk away and

---

[1] The aunt is the sister of D.F.'s mother. On June 8, 2014, the aunt and Harley Farrell lived with D.F.'s family, which consisted of D.F., his parents, and his two younger sisters.

disengage.)

{¶ 8} As Adams walked away, a still-enraged D.F. came up behind Adams, striking Adams with a right-handed "haymaker" which landed against Adams's right temple area. Adams was immediately rendered unconscious, and D.F. then grabbed Adams around the waist and flipped him backward, driving him head first into the pavement. With Adams "unconscious and defenseless on the pavement," D.F. struck Adams in the face and head several more times. Farrell, who had not been involved in the altercation up to this point, kicked Adams's head as Adams lay unconscious on the ground.

{¶ 9} At approximately 4:30 a.m., the police were dispatched to the scene on a "medical assistance" call. Officer Harry Dilley found Adams unconscious on the sidewalk, and he initially did not know if Adams's condition was the result of an assault or a seizure. Adams was transported to Miami Valley Hospital, where he had surgery to remove pressure on his brain. Adams remained in a coma and had respiratory failure, both due to damage to his brain stem. The right side of Adams's skull, Adams's nose, and the left side of Adams's jaw and eye socket were also broken, and he had various scrapes and bruises. Adams never regained consciousness.

{¶ 10} After his stay at Miami Valley Hospital, Adams was treated at Drake Hospital in Cincinnati, then transported to Liberty Nursing Facility. He ultimately was transferred to Hospice. Adams died on August 27, 2014 as a result of the blunt force trauma to the right side of his head. The trial court rejected, as "utterly incredible," D.F.'s argument that Farrell's kick to Adams's head as Adams lay unconscious was, alone, the fatal blow.

{¶ 11} Dayton Police Detective Rod Roberts, a member of the homicide squad, began an investigation into the assault on Adams at approximately 7:30 p.m. on June 8,

the day of the assault. Within a couple days, Roberts identified Farrell and D.F. as suspects. On the morning of June 10, 2014, Roberts asked Officer Mitch Olmsted, who had worked for approximately 20 years in the neighborhood where the assault occurred, to locate D.F. and Farrell. Olmsted did so, and he (Olmsted) and Officer Edmond Trick brought D.F. and Farrell to the police department for interviews.

{¶ 12} During D.F.'s interview (at approximately 9:30 a.m.), D.F. initially stated that Farrell was the primary aggressor and that Farrell had assaulted Adams due to statements Adams had made about Farrell's mother. Detective Roberts stopped the interview with D.F. and went back to D.F.'s neighborhood to interview people about the events. Roberts concluded that D.F.'s statements were inaccurate.

{¶ 13} Detective Roberts returned to the police department and interviewed Farrell. The interview led Roberts to believe that D.F. was the primary suspect. Roberts re-interviewed D.F. at approximately 3:00 p.m., at which time D.F. admitted to hitting Adams, picking Adams up and "dunking" him while Adams was unconscious, and hitting Adams a few more times after Adams hit the ground. D.F. wrote a written statement and gave written responses to Roberts's written follow-up questions. Roberts took photographs of injuries to D.F.'s hands (cuts, scrapes, and swollen fingers and knuckles) and left elbow (a scrape that D.F. said occurred when he slammed Adams to the sidewalk). D.F. was placed under arrest.

{¶ 14} The following day (June 11), D.F. was charged by complaint with felonious assault in juvenile court. On June 27, 2014, the State filed a motion, pursuant to R.C. 2152.10(B) and 2152.12(B), to transfer the matter to the General Division so that D.F. could be tried as an adult. On July 30, the juvenile court held a probable cause hearing,

at which time D.F. waived his right to present testimony on probable cause. In an August 4, 2014 decision, the juvenile court concluded that D.F. was more than 14 years old at the time of the offense, that the act alleged would be a felony if committed by an adult, that sufficient evidence exists within the statement of facts as detailed by the State to find probable cause, and that there was probable cause to believe that D.F. committed felonious assault. The trial court ordered a mental examination of D.F. and that the probation department prepare a social history. An amenability hearing was scheduled for September 17, 2014.

{¶ 15} On September 8, 2014, after Adams's death, the State filed an amended complaint, charging D.F. with felonious assault and murder. Contemporaneously, the State filed another motion to transfer the matter to adult court. The amenability hearing on the felonious assault charge was continued to October 31, 2014.

{¶ 16} On October 31, 2014 the juvenile court held a probable cause hearing regarding the murder charge and an amenability hearing regarding the felonious assault charge. The juvenile court concluded that there was probable cause to believe that D.F. had committed murder, an unclassified felony, and the court transferred that charge to adult court pursuant to R.C. 2152.10(A)(1)(a) and R.C. 2152.12(A)(1)(a), the mandatory transfer provisions. The same day, the juvenile court filed a written entry, finding probable cause and granting the State's motion to relinquish jurisdiction and transfer the murder charge to adult court under the mandatory transfer provisions.

{¶ 17} With respect to the amenability hearing for the felonious assault charge, the parties stipulated to the psychological report; no testimony was presented. Upon considering the factors listed in R.C. 2152.12(D) and (E), the juvenile court concluded

that D.F. was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions. By separate entry, the juvenile court certified D.F. to the adult court for prosecution for the felonious assault under the discretionary transfer provisions.

{¶ 18} For both the murder and felonious assault charges, the juvenile court ordered that D.F. be detained by the juvenile court until the proceeding in adult court was concluded.

{¶ 19} On December 23, 2014, D.F. was indicted for felonious assault and murder. D.F. entered a plea of not guilty by reason of insanity.

{¶ 20} In April 2015, D.F. moved to suppress the statements he had made to the police, arguing that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights and that his statements were not voluntarily made. The disputed statements consisted of those given on June 10 during his interviews with Detective Roberts, as well as statements heard by other officers in connection with court proceedings in the juvenile court on December 23, 2014, and January 15, 2015. In response to certain testimony provided at the first hearing on the motion to suppress, D.F. filed a supplemental motion to suppress, arguing that his statements on June 10, 2014 were the result of an unlawful arrest, in violation of his Fourth Amendment rights.

{¶ 21} Testimony on the motions to suppress was taken on three dates: June 12, 2015, July 10, 2015, and August 7, 2015. On November 3, 2015, the trial court granted in part and overruled in part the motions to suppress. Of relevance here, the trial court denied the portion of D.F.'s motions to suppress related to the statements he had made on June 10, 2014.

{¶ 22} D.F. waived his right to a jury trial, and the matter was tried to the court on February 1 and 2, 2016. The trial court found that, throughout the altercation, D.F. "[w]as under the influence of sudden passion or in sudden fit of rage owing to serious provocation by Mr. Adams that was reasonably sufficient to incite Defendant into using deadly force in the heat of blood without time to reflect or for passions to cool and 2) Mr. Adams'[s] provocation was sufficient to arouse the passions of an ordinary person beyond the power of his or her control, particularly given Defendant's emotional and mental state and the conditions and circumstances that surrounded Defendant at the time of his acts." The trial court found D.F. guilty of aggravated assault and voluntary manslaughter, inferior offenses of felonious assault and murder, respectively.

{¶ 23} The trial court merged the voluntary manslaughter and the aggravated assault at sentencing, and sentenced D.F. to the maximum prison term of eleven years for the voluntary manslaughter, a first-degree felony; pursuant to R.C. 2929.13(F), the court imposed a mandatory prison term. The court ordered D.F. to pay restitution of $2,884.75 and court costs.

{¶ 24} D.F. appeals from his conviction, challenging his bindover from the juvenile court, the trial court's ruling on his motions to suppress, and his sentence. For the reasons that follow, we only need to address his bindover from juvenile court to adult court.

## II. Transfers from Juvenile Court

{¶ 25} In his fifth assignment of error, D.F. claims that the trial court abused its discretion when it determined that he was not amenable to treatment in the juvenile system.

{¶ 26} R.C. 2152.12 governs the transfer from juvenile court to the appropriate adult court for criminal prosecution. Historically, two types of transfer existed under Ohio's juvenile justice system: discretionary and mandatory. *State v. Hanning*, 89 Ohio St.3d 86, 728 N.E.2d 1059 (2000); R.C. 2152.10(A) and (B); R.C. 2152.12(A) and (B). The Ohio Supreme Court recently held that the mandatory-transfer statutes violate the right to due process as guaranteed by Article I, Section 16 of the Ohio Constitution. *State v. Aalim*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-8278. The Supreme Court severed R.C. 2152.10(A) and 2152.12(A) and stated that the transfer of juveniles previously subject to mandatory transfer may still occur pursuant to the discretionary bindover provisions, R.C. 2152.10(B) and R.C. 2152.12(B). The Ohio Supreme Court expressly held that the discretionary transfer process satisfies fundamental fairness under the Ohio Constitution.

{¶ 27} In *Aalim*, the Ohio Supreme Court reversed the court of appeals' judgment and remanded the case to the juvenile court for an amenability hearing on Aalim's aggravated robbery charge. *Aalim* at ¶ 32. On February 22, 2017, the Ohio Supreme Court stayed the execution of its judgment in *Aalim*, pending a decision on the State's motion for reconsideration. *See* 02/22/2017 Case Announcements, 2017-Ohio-573. The stay of that remand does not affect the Supreme Court's underlying holding regarding the constitutionality of the mandatory bindover provisions.

{¶ 28} D.F.'s initial brief was filed prior to *Aalim*, and it did not challenge the mandatory bindover on the murder charge. D.F. has filed a notice of supplemental authority, citing *Aalim* and *State v. D.B.*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-8334, but he has not expressly argued that the case must be remanded to the juvenile court for

an amenability hearing on the murder charge.

{¶ 29} In this case, the only difference between the murder and felonious assault charges before the juvenile court was that the victim, Adams, ultimately died from his injuries. The conduct and circumstances underlying the two charges and the reports submitted to the trial court for purposes of an amenability hearing (the disposition investigation report and psychological report) would have been identical for both charges.

{¶ 30} Nevertheless, the juvenile court addressed the felonious assault and murder charges separately, and it transferred the murder charge to adult court pursuant to the mandatory bindover provisions in a separate entry. In accordance with *Aalim*, that procedure was unconstitutional. We recognize that the juvenile court held an amenability hearing on the felonious assault charge on the same day as the probable cause hearing on the murder charge, and that the juvenile court likely would have reached the same amenability decision on the murder charge as the felonious assault charge. Nevertheless, the juvenile court was required to hold an amenability hearing for purposes of both charges. We therefore conclude that D.F.'s conviction for voluntary manslaughter, as an inferior offense of murder, must be vacated, and the matter must be remanded to the juvenile court for an amenability hearing on the murder charge.

{¶ 31} In a separate entry, the juvenile court transferred the felonious assault charge to adult court pursuant to the discretionary bindover provisions. R.C. 2152.12(B) grants the juvenile court discretion to transfer a case to the common pleas court for prosecution if the child is delinquent for committing an act that would be a felony if committed by an adult and the court finds (1) the child was age 14 or older at the time of the act charged, (2) there is probable cause to believe that the child committed the act

charged, and (3) the child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions.   R.C. 2152.12(B); *see also* Juv.R. 30(C).

{¶ 32} Before transferring, the juvenile court must "order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child."   R.C. 2152.12(C).   R.C. 2152.12(B) further provides:

In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred.   The record shall indicate the specific factors that were applicable and that the court weighed.

{¶ 33} R.C. 2152.12(D) and (E) "enumerate nonexhaustive factors in favor of and against transfer, respectively, for the juvenile court to consider."   *Aalim* at ¶ 27.   These factors include, among others, the harm suffered by the victim, the child's relationship with the victim, whether a firearm was involved, the child's previous experiences in the juvenile system, whether there was sufficient time to rehabilitate the child within the juvenile system, whether the child acted under provocation, whether the child was the principal actor, whether the child had previously been adjudicated a delinquent child, and the emotional, physical, and psychological maturity of the child.   *See* R.C. 2152.12(D) and (E).

{¶ 34} Upon consideration of the statutory factors, the juvenile court found that

D.F. was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions on the felonious assault charge.

{¶ 35} We conclude, however, that the juvenile court's amenability determination was of no effect, in light of R.C. 2152.12(I).   R.C. 2152.12(I) provides:

Upon the transfer of a case under division (A) or (B) of this section, the juvenile court shall state the reasons for the transfer on the record, and shall order the child to enter into a recognizance with good and sufficient surety for the child's appearance before the appropriate court for any disposition that the court is authorized to make for a similar act committed by an adult. The transfer abates the jurisdiction of the juvenile court with respect to the delinquent acts alleged in the complaint, and, upon the transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and the case then shall be within the jurisdiction of the court to which it is transferred as described in division (H) of section 2151.23 of the Revised Code.

{¶ 36} We have repeatedly interpreted R.C. 2152.12(I) to mandate the transfer of a discretionary-transfer offense when it is founded on the same course of conduct as another offense which must be transferred.   *See State v. Brookshire*, 2d Dist. Montgomery No. 25853, 2014-Ohio-1971; *State v. Henderson*, 2d Dist. Montgomery No. 21866, 2007-Ohio-5368; *State v. Washington*, 2d Dist. Montgomery No. 20226, 2005-Ohio-6546, ¶ 25.

{¶ 37} In *Washington*, the juvenile-defendant was charged in juvenile court with

carrying a concealed weapon and aggravated robbery involving use of a deadly weapon. The juvenile court determined that the aggravated robbery was a mandatory-bindover offense, and it transferred the case to adult court. Washington moved in the adult court to dismiss the CCW charge, arguing that the juvenile court acted improperly when it ordered him bound over on that charge. We rejected Washington's argument, reasoning:

> None of the [mandatory bindover] provisions cited above apply to the CCW charge, which is a non-category offense. However, R.C. 2152.12(I) provides that when a "case" is transferred pursuant to division (A) of that section "[t]he transfer abates the jurisdiction of the juvenile court with respect to the delinquent acts alleged in the complaint, and, upon the transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and the case then shall be within the jurisdiction of the court to which it is transferred as described in division (H) of section 2151.23 of the Revised Code." R.C. 2151.23(H) likewise terminates the jurisdiction of the juvenile division after a transfer is ordered.

> There is no constitutional right to be tried as a juvenile. Rather, recognizing the value of treating juveniles differently, the General Assembly, acting pursuant to the authority conferred on it by Article IV, Section 4(B) of the Ohio Constitution to determine the jurisdiction of the court of common pleas and its divisions, has conferred exclusive jurisdiction over alleged juvenile offenders on the juvenile division of the court of common pleas. R.C. 2151.26. [sic] Statutory provisions creating

exceptions to that jurisdiction through transfer to the general division, whether discretionary or mandatory, likewise represent an exercise of the General Assembly's power. R.C. 2[1]52.12(I), which mandates transfer of a "non-category" offense charge when it is founded on the same course of conduct as another offense which must be transferred, is such a jurisdictional provision. Its object is judicial economy; to prevent dual proceedings in the two divisions. Presumably, the General Assembly has found that the value of judicial economy in that regard outweighs any benefit that would otherwise accrue by treating the alleged offender as a juvenile.

Because the alleged aggravated robbery and CCW offenses underlying Defendant's two delinquency charges arose from a common nucleus of operative facts, and the juvenile division having properly ordered proceedings on the aggravated robbery charge transferred to the general division pursuant to R.C. 2152.12(A)(1(b) [sic], all further proceedings in the juvenile division on the CCW charge in the "case" were thereafter discontinued per R.C. 2152.12(I) and the juvenile division's jurisdiction was terminated. The juvenile division court was then relieved of any requirement that R.C. 2152.12(F) otherwise imposes to conduct further hearings or to make findings with respect to Defendant's eligibility to be tried as a juvenile on the CCW offense before transferring proceedings on that charge to the general division. The juvenile division's bind-over order operated to confer exclusive jurisdiction to adjudicate those charges on the general division court.

*Washington* at ¶ 24-26.

**{¶ 38}** We applied *Washington* in *Henderson*, in which the juvenile-defendant was charged with kidnapping, aggravated robbery, aggravated burglary and two counts of abduction, each of which included a firearm specification.   The juvenile court determined that the aggravated robbery and aggravated burglary offenses required transfer to adult court.   Although abduction and kidnapping were not mandatory-transfer offenses, we held that the juvenile court properly transferred the entire proceedings to adult court, pursuant to R.C. 2152.12(I).   Citing *Washington*, we concluded the juvenile court's jurisdiction over the abduction and kidnapping charges was terminated upon properly ordering that proceedings on the mandatory-bindover offenses be transferred to the general division of the common pleas court pursuant to R.C. 2152.12(A)(1)(b).   We further stated that, "because the juvenile court had appropriately transferred all further proceedings pertaining to the act charged, it was not required to make findings pursuant to [R.C.] 2152.12(B) as to whether Henderson was amenable to care or rehabilitation within the juvenile system, or whether the safety of the community required that he be subject to adult sanctions."   *Henderson* at ¶ 14.

**{¶ 39}** More recently, in *Brookshire*, the defendant asked us to "revisit our interpretation and application of R.C. 2152.12(I) in *Washington* and *Henderson*." *Brookshire* at ¶ 16.   We declined to do so, concluding that "we will continue to interpret R.C. 2152.12(I) to mandate the transfer of a discretionary transfer offense when it is founded on the same course of conduct as another offense which must be transferred." *Brookshire* at ¶ 21.

**{¶ 40}** Here, once the trial court determined that it was required to transfer the

murder charge to adult court pursuant to the mandatory bindover statutes, the juvenile court was required to transfer the felonious assault charge, which was founded on the same course of conduct as the murder charge. The juvenile court's jurisdiction over both charges terminated, and the juvenile court was not required to conduct an amenability hearing with respect to the felonious assault charge. Although the juvenile court, in fact, held an amenability hearing on the felonious assault charge, that hearing and the juvenile court's subsequent discretionary transfer order has no import. Consequently, because the trial court failed to hold an amenability hearing on the murder charge and the felonious assault charge was bound over due to the mandatory bindover on the murder charge, the adult court's actions with respect to the felonious assault charge must also be vacated.

{¶ 41} For us to conclude otherwise would leave this matter straddled between two courts. Specifically, if we were to vacate only the judgment related to the murder charge (i.e., the voluntary manslaughter conviction), the guilty verdict for aggravated assault (an inferior offense of felonious assault) would remain in adult court while the murder charge would be remanded to the juvenile court. Although it is possible that the murder charge would again be transferred to adult court, it is also possible that the murder charge could stay in juvenile court, resulting in proceedings in both adult court (aggravated assault) and juvenile court (murder) on charges arising out of the same course of conduct. This would circumvent the object of R.C. 2152.12(I), i.e., to prevent dual proceedings in the two divisions. *See Washington* at ¶ 25.

{¶ 42} Given the Ohio Supreme Court's ruling in *Aalim*, D.F.'s conviction for voluntary manslaughter is vacated. Pursuant to R.C. 2152.12(I) and *Washington*, D.F.'s guilty verdict for aggravated assault must also be vacated.

## III. Conclusion

{¶ **43**} The trial court's judgment will be reversed. The trial court shall enter an order causing D.F. to be transferred forthwith back to the Montgomery County Juvenile Detention Facility on the delinquency complaint. The matter will be remanded to the juvenile court for further proceedings consistent with the court's opinion.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, P.J., dissenting:

{¶ **44**} I would not reverse and remand this case to juvenile court for two reasons: (1) D.F. did not assign any error to the mandatory nature of the transfer of the murder case from juvenile court to the general division and, therefore, given the facts of this case, we should not take notice of plain error; and (2) because the trial court conducted an amenability hearing and determined that D.F. was not amenable to treatment in the juvenile system on the felonious-assault charge, the predicate offense for the felony-murder charge, any error in transferring the murder charge, under the unique facts of this case, is harmless.

{¶ **45**} None of D.F.'s five assignments of error challenge the transfer of the murder charge to adult court, the general division of the common pleas court. The only assignment dealing with transfer at all is the fifth, which challenges the outcome of the amenability hearing. But that only dealt with transfer of the felonious-assault charge, not the murder count. The appellant's framing of the issue for that assignment of error indicates the narrow focus: *"Was it unreasonable for the juvenile court to transfer [D.F.'s] felonious assault charge to criminal court when the juvenile court failed to consider the*

*full range of dispositional options available to rehabilitate [D.F.] while also protecting the safety of the community?" (*Appellant's Brief, Issue presented for review, Pg. ii). I recognize that *State v. Aalim*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-8278 (currently stayed pending reconsideration),[2] holding that mandatory transfer of juvenile cases for those statutorily listed charges is unconstitutional, was decided after briefing was completed. However, D.F. filed a notice of supplemental authority, citing *Aalim* and a related case, but did not request that we consider an additional or supplemental assignment of error challenging transfer of the murder charge. Whether he failed to do so because he had been found guilty of a lesser included offense of voluntary manslaughter, resulting in a sentence of 11 years in prison rather than exposure to a statutory murder sentence of 15 years to life, is unknown. Under these circumstances, I would not notice and decide the case on an unassigned error.

**{¶ 46}** The unique facts and procedure in this case also render any error about transfer of the murder charge harmless. D.F. was charged with delinquency by virtue of felonious assault related to the June 8, 2014 beating of Ryan Adams on June 11, 2014. The trial court found probable cause to proceed on August 4, 2014 and scheduled the felonious-assault charge for an amenability hearing on September 17, 2014. In the interim, on August 27, 2014, Adams died and a murder charge was added on September

---

[2] The *Aalim* case involved mandatory transfer of an aggravated robbery case involving a firearm specification, an R.C. 2152.02 "category two" offense, which was mandatorily transferred under R.C. 2152.10(A)(2). One might distinguish the case here because it involves transfer of an R.C. 2152.02 "category one" murder charge. Category one includes only aggravated murder and murder or attempts at either. A fair reading of the *Aalim* majority opinion would mean that any mandatory transfer is a violation of Article I, Section16 of the Ohio Constitution, regardless of the severity of the charge. Needless to say, until a decision on reconsideration of *Aalim* is issued, the efficacy or extent of the holding is uncertain.

8, 2014. The amenability hearing on felonious assault was continued and was conducted on October 31, 2014. In an entry separate from the mandatory transfer of the murder case, the trial court ordered transfer of the felonious assault charge to adult court under the discretionary-transfer provisions of R.C. 2152.12.

{¶ 47} The murder count in the September 8, 2014 amended complaint refers to causing death of Ryan Adams as a proximate result of committing felonious assault on June 8, 2014, "an act contrary to Section 2903.02(B) of the Ohio Revised code," which is Ohio's felony-murder statute. That means the only difference between the felonious-assault charge, for which there was an amenability hearing, and the felony-murder charge, which mandatorily was transferred, is that the serious physical harm imposed upon the victim eventually resulted in death. It is inconceivable and impossible to imagine that D.F., found not amenable to treatment in juvenile court for felonious assault, ever could be found amenable to treatment for murder as a proximate result of the felonious assault based on the same incident. That makes the lack of an amenability hearing on the murder charge a harmless, inconsequential error.

{¶ 48} Accordingly, I dissent from the reversal and remand. In light of the majority decision, it is unnecessary to address the remaining four assignments of error.

Copies mailed to:

Lynne R. Nothstine
Francisco E. Luttecke
Charlyn Bohland
Hon. Steven K. Dankof
Hon. Anthony Capizzi