[Cite as *State v. Ferguson*, 2017-Ohio-7930.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   27032 |
| | : | |
| v. | : | T.C. NO. 14CR2059/3 |
| | : | |
| DARRYL FERGUSON | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ____29th___ day of _____September_____, 2017.

. . . . . . . . . . .

LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

FRANCISCO E. LUTTECKE, Atty. Reg. No. 0082866 and CHARLYN BOHLAND, Atty. Reg. No. 0088080, Assistant State Public Defenders, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
      Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

      **{¶ 1}** Darryl Ferguson was found guilty after a bench trial in the Montgomery County Court of Common Pleas, General Division, of aggravated assault, an inferior offense of felonious assault, and voluntary manslaughter, an inferior offense of murder.

The trial court merged the two charges and sentenced D.F. to a mandatory term of eleven years in prison, pursuant to R.C. 2929.13(F), for voluntary manslaughter. D.F. was 16 years old at the time of the offense, and 18 years old when he was convicted.

{¶ 2} Ferguson appeals from his conviction, raising five assignments of error.[1] He claims that (1) the trial court erred in using a prior juvenile adjudication to impose a mandatory prison term, (2) the trial court erred in failing to suppress statements that he made to the police; (3) the trial court erred in imposing a maximum sentence, (4) the trial court erred in failing to sentence him in accordance with R.C. 2152.121, and (5) the juvenile court abused its discretion in finding that he was not amenable to treatment in the juvenile system. For the following reasons, the trial court's judgment will be reversed, and the matter will be remanded to the trial court for resentencing and compliance with R.C. 2152.121.

### I. Background and Procedural History

{¶ 3} In its verdict following the bench trial, the trial court found the following facts.

{¶ 4} In the early morning hours of June 8, 2014, 35-year-old Ryan Adams approached Ferguson's mother and his fifteen-year-old sister as they stood outside their home in Dayton. Adams stated to them that "everybody needs a playmate, do you want to play with me?" or similar sexually-suggestive words. Ferguson's mother and sister

---

[1] On May 19, 2017, without addressing Ferguson's specific assignments of error, we vacated his conviction and remanded the matter to the juvenile court. *State v. D.F.*, 2d Dist. Montgomery No. 27032, 2017-Ohio-2882. We relied on the Ohio Supreme Court's decision in *State v. Aalim*, Ohio S.Ct. Slip Opinion No. 2016-Ohio-8278 (*Aalim I*) and our court's interpretation of R.C. 2152.12(I). After the Ohio Supreme Court reconsidered its decision in *Aalim I*, the State filed an application for reconsideration in this case. In light of *State v. Aalim*, Ohio S.Ct. Slip Opinion No. 2017-Ohio-2956 (*Aalim II*), we granted the State's application and vacated our May 19, 2017 Opinion and Judgment.

indicated they did not, and Adams walked some distance away, but stopped, turned around with his arms folded, and stared at them. Ferguson's mother and sister became "worried and anxious," and the sister proceeded to call Ferguson (her sixteen-year-old brother), Harley Farrell (the boyfriend of her maternal aunt)[2], or both, requesting that Ferguson and Farrell return to the area. Ferguson, Farrell, and the aunt had walked down the street to see some "commotion" that was occurring there.

{¶ 5} Ferguson and Farrell arrived separately but at approximately the same time, and Ferguson began questioning his mother and sister regarding the nature of their concern. Upon learning that Adams had made suggestive remarks and had yet to leave the neighborhood, Ferguson became "angry and furious," and he and Farrell attempted to locate Adams. Ferguson and Farrell found Adams nearby, and Adams returned voluntarily with Ferguson and Farrell to Ferguson's home. When Ferguson's sister confirmed that "he was the guy" who had made the sexually-suggestive remarks, Ferguson became even more enraged and furious, and he demanded that Adams leave the neighborhood and never disrespect his family again.

{¶ 6} Adams "did not take kindly" to Ferguson's demands. Rather, Adams pulled off his shirt and challenged Ferguson, a "much younger and smaller" individual, to a fight; Adams called Ferguson a "punk" and spewed a stream of profanity and epithets. Ferguson and Adams, "in mutual combat, squared off in the street." Ultimately, Ferguson struck Adams several times in the face, dropping Adams to his buttocks on the grass next to the street. Adams was down only momentarily and regained his feet.

---

[2] The aunt is the sister of Ferguson's mother. On June 8, 2014, the aunt and Harley Farrell lived with Ferguson's family, which consisted of Ferguson, his parents, and his two younger sisters.

Then, after the two combatants "exchanged further epithets and other unpleasantries," Adams did not re-engage Ferguson, but instead turned and walked away from Ferguson, ending the mutual combat. (The trial court expressly rejected, as not credible, testimony that Adams did not walk away and disengage.)

{¶ 7} As Adams walked away, a still-enraged Ferguson came up behind Adams, striking Adams with a right-handed haymaker which landed against Adams's right temple area. Adams was immediately rendered unconscious, and Ferguson then grabbed Adams around the waist and flipped him backward, driving him head first into the pavement. With Adams "unconscious and defenseless on the pavement," Ferguson struck Adams in the face and head several more times. Farrell, who had not been involved in the altercation up to this point, kicked Adams's head as Adams lay unconscious on the ground.

{¶ 8} At approximately 4:30 a.m., the police were dispatched to the scene on a "medical assistance" call. Officer Harry Dilley found Adams unconscious on the sidewalk, and he initially did not know if Adams's condition was the result of an assault or a seizure. Adams was transported to Miami Valley Hospital, where he had surgery to remove pressure on his brain. Adams remained in a coma and had respiratory failure, both due to damage to his brain stem. The right side of Adams's skull, Adams's nose, and the left side of Adams's jaw and eye socket were also broken, and he had various scrapes and bruises. Adams never regained consciousness.

{¶ 9} After his stay at Miami Valley Hospital, Adams was treated at Drake Hospital in Cincinnati, then transported to Liberty Nursing Facility. He ultimately was transferred to Hospice. Adams died on August 27, 2014 as a result of the blunt force trauma to the

right side of his head. The trial court rejected, as "utterly incredible," Ferguson's argument that Farrell's kick to Adams's head as Adams lay unconscious was, alone, the fatal blow.

{¶ 10} Dayton Police Detective Rod Roberts, a member of the homicide squad, began an investigation into the assault on Adams at approximately 7:30 p.m. on June 8, the day of the assault. Within a couple days, Roberts identified Farrell and Ferguson as suspects. On the morning of June 10, 2014, Roberts asked Officer Mitch Olmsted, who had worked for approximately 20 years in the neighborhood where the assault occurred, to locate Ferguson and Farrell. Olmsted did so, and he (Olmsted) and Officer Edmond Trick brought Ferguson and Farrell to the police department for interviews.

{¶ 11} During Ferguson's interview (at approximately 9:30 a.m.), Ferguson initially stated that Farrell was the primary aggressor and that Farrell had assaulted Adams due to statements Adams had made about Farrell's mother. Detective Roberts stopped the interview with Ferguson and went back to Ferguson's neighborhood to interview people about the events. Roberts concluded that Ferguson's statements were inaccurate.

{¶ 12} Detective Roberts returned to the police department and interviewed Farrell. The interview led Roberts to believe that Ferguson was the primary suspect. Roberts re-interviewed Ferguson at approximately 3:00 p.m., at which time Ferguson admitted to hitting Adams, picking Adams up and "dunking" him while Adams was unconscious, and hitting Adams a few more times after Adams hit the ground. Ferguson wrote a written statement and gave written responses to Roberts's written follow-up questions. Roberts took photographs of injuries to Ferguson's hands (cuts, scrapes, and swollen fingers and knuckles) and left elbow (a scrape that Ferguson said occurred when

he slammed Adams to the sidewalk).   Ferguson was placed under arrest.

{¶ 13} The following day (June 11), Ferguson was charged by complaint with felonious assault in juvenile court.   On June 27, 2014, the State filed a motion, pursuant to R.C. 2152.10(B) and 2152.12(B), to transfer the matter to the General Division so that Ferguson could be tried as an adult.   On July 30, the juvenile court held a probable cause hearing, at which time Ferguson waived his right to present testimony on probable cause. In an August 4, 2014 decision, the juvenile court concluded that Ferguson was more than 14 years old at the time of the offense, that the act alleged would be a felony if committed by an adult, that sufficient evidence exists within the statement of facts as detailed by the State to find probable cause, and that there was probable cause to believe that Ferguson committed felonious assault.   The trial court ordered a mental examination of Ferguson and that the probation department prepare a social history.   An amenability hearing was scheduled for September 17, 2014.

{¶ 14} On September 8, 2014, after Adams's death, the State filed an amended complaint, charging Ferguson with felonious assault and murder.   Contemporaneously, the State filed another motion to transfer the matter to adult court.   The amenability hearing on the felonious assault charge was continued to October 31, 2014.

{¶ 15} On October 31, 2014 the juvenile court held a probable cause hearing regarding the murder charge and an amenability hearing regarding the felonious assault charge.   The juvenile court concluded that there was probable cause to believe that Ferguson had committed murder, an unclassified felony, and the court transferred that charge to adult court pursuant to R.C. 2152.10(A)(1)(a) and R.C. 2152.12(A)(1)(a), the mandatory transfer provisions.   The same day, the juvenile court filed a written entry,

finding probable cause and granting the State's motion to relinquish jurisdiction and transfer the murder charge to adult court under the mandatory transfer provisions.

{¶ 16} With respect to the amenability hearing for the felonious assault charge, the parties stipulated to the psychological report; no testimony was presented. Upon considering the factors listed in R.C. 2152.12(D) and (E), the juvenile court concluded that Ferguson was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions. By separate entry, the juvenile court certified Ferguson to the adult court for prosecution for the felonious assault under the discretionary transfer provisions.

{¶ 17} For both the murder and felonious assault charges, the juvenile court ordered that Ferguson be detained by the juvenile court until the proceeding in adult court was concluded.

{¶ 18} On December 23, 2014, Ferguson was indicted for felonious assault and murder. Ferguson entered a plea of not guilty by reason of insanity.

{¶ 19} In April 2015, Ferguson moved to suppress the statements he had made to the police, arguing that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights and that his statements were not voluntarily made. The disputed statements consisted of those given on June 10 during his interviews with Detective Roberts, as well as statements heard by other officers in connection with court proceedings in the juvenile court on December 23, 2014, and January 15, 2015. In response to certain testimony provided at the first hearing on the motion to suppress, Ferguson filed a supplemental motion to suppress, arguing that his statements on June 10, 2014 were the result of an unlawful arrest, in violation of his Fourth Amendment rights.

{¶ 20} Testimony on the motions to suppress was taken on three dates: June 12, 2015, July 10, 2015, and August 7, 2015. On November 3, 2015, the trial court granted in part and overruled in part the motion to suppress. Of relevance here, the trial court denied the portion of Ferguson's motion to suppress related to the statements he had made on June 10, 2014.

{¶ 21} Ferguson waived his right to a jury trial, and the matter was tried to the court on February 1 and 2, 2016. The trial court further found that, throughout the altercation, Ferguson "[w]as under the influence of sudden passion or in sudden fit of rage owing to serious provocation by Mr. Adams that was reasonably sufficient to incite Defendant into using deadly force in the heat of blood without time to reflect or for passions to cool and 2) Mr. Adams'[s] provocation was sufficient to arouse the passions of an ordinary person beyond the power of his or her control, particularly given Defendant's emotional and mental state and the conditions and circumstances that surrounded Defendant at the time of his acts." The trial court found Ferguson guilty of aggravated assault and voluntary manslaughter, inferior offenses of felonious assault and murder, respectively.

{¶ 22} The trial court merged the voluntary manslaughter and the aggravated assault at sentencing, and sentenced Ferguson to a maximum prison term of eleven years for the voluntary manslaughter, a first-degree felony; pursuant to R.C. 2929.13(F), the court imposed a mandatory prison term. The court ordered Ferguson to pay restitution of $2,884.75 and court costs.

{¶ 23} Ferguson appeals from his conviction, challenging his bindover from the juvenile court on the felonious assault charge, the trial court's ruling on his motion to suppress, and his sentence. We will address his assignments of error in that order.

## II. Transfer from Juvenile Court

{¶ 24} In his fifth assignment of error, Ferguson claims that the trial court abused its discretion when it determined that Ferguson was not amenable to treatment in the juvenile system following an amenability hearing on the felonious assault charge.

{¶ 25} R.C. 2152.10 and 2152.12 govern the transfer from juvenile court to the appropriate adult court for criminal prosecution. Two types of transfer exist under Ohio's juvenile justice system: discretionary and mandatory. The mandatory transfer provisions remove discretion from the juvenile judge in the transfer decision in certain circumstances, including when the child is 16 or 17 years old and there is probable cause to believe that the child committed aggravated murder, murder, or attempted murder. *See* R.C. 2152.12(A)(1)(a); *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 10.

{¶ 26} R.C. 2152.12(B) grants the juvenile court discretion to transfer a case to the common pleas court for prosecution if the child is delinquent for committing an act that would be a felony if committed by an adult and the court finds (1) the child was age 14 or older at the time of the act charged, (2) there is probable cause to believe that the child committed the act charged, and (3) the child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. R.C. 2152.12(B); *see also* Juv.R. 30(C).

{¶ 27} In addition, R.C. 2152.12(I) provides:

Upon the transfer of a case under division (A) or (B) of this section, the juvenile court shall state the reasons for the transfer on the record, and shall order the child to enter into a recognizance with good and sufficient surety

for the child's appearance before the appropriate court for any disposition that the court is authorized to make for a similar act committed by an adult. The transfer abates the jurisdiction of the juvenile court with respect to the delinquent acts alleged in the complaint, and, upon the transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and the case then shall be within the jurisdiction of the court to which it is transferred as described in division (H) of section 2151.23 of the Revised Code.

{¶ 28} As stated above, the trial court transferred Ferguson to adult court on the murder charge based on the mandatory transfer provisions. The juvenile court held an amenability hearing regarding the felonious assault charge and transferred that charge under the discretionary transfer provisions. On appeal, Ferguson focuses on the discretionary transfer.

{¶ 29} At the outset, we consider whether the juvenile court's entry is sufficient to allow us to review its amenability determination. Although not cited by Ferguson, we note that the juvenile court's judgment entry is substantially similar to the entry reviewed by this court in *State v. D.H.*, 2d Dist. Montgomery No. 26383, 2015-Ohio-3259.

{¶ 30} In *D.H.*, a 17-year-old youth with no history in the juvenile system was bound over to adult court for prosecution of two counts of robbery, both felonies of the second degree. As here, the juvenile court in D.H. held an amenability hearing, during which the parties stipulated to the report filed by the court psychologist, which indicated that she had interviewed D.H. and reviewed numerous other reports. The principal of the youth's school also testified that D.H. had been expelled as a freshman after more

than 40 incidents of skipping class and leaving the building during school hours.

{¶ 31} On review, we held in *D.H.* that the juvenile court did not provide a "sufficient explanation" for us to review its decision that D.H. was not amenable to care or treatment in the juvenile system. We noted the juvenile's court's entry did not identify the reports and records reviewed by the psychologist (only the content of the psychologist report was admitted), and it did not identify or discuss what programs were available in the juvenile system to satisfy D.H's health and educational needs, as identified in the psychologist report. We further noted that D.H.'s age at the time of the amenability hearing would have given him more than 3 years for rehabilitation in the juvenile system, and yet the juvenile court's findings contained no discussion of what rehabilitation goals could or could not be accomplished in the juvenile system in that period, or what programs were or were not available in the juvenile system to accomplish these goals. The psychologist report did not include a recommendation of whether D.H. could be rehabilitated in the juvenile justice system.

{¶ 32} Although the judgment entries in this case and *D.H.* are similar, *D.H.* is readily distinguishable. In *D.H.*, our inability to review the juvenile court's amenability determination stemmed in large part from the fact that D.H. had no prior history in the juvenile justice system. The juvenile court had information that D.H. had a poor school attendance record, which ultimately resulted in his expulsion, but there was no indication that the juvenile court had information about how those behaviors and punishments would translate to the services and sanctions available through the juvenile court. Neither the psychologist's report nor the juvenile court entry discussed any of the programs or structure available in the juvenile justice system that could address D.H.'s needs, and the

psychologist made no recommendation as to whether D.H. could be rehabilitated in the juvenile justice system.

{¶ 33} In contrast, Ferguson's involvement with the juvenile justice system began in 2011. The dispositional investigative report (DIR) indicates that Ferguson's prior delinquent behaviors included aggravated menacing, unruly/runaway (7 times), VCO/EHM (9 times), bicycle rules, domestic violence (3 times), felonious assault (2 times), resisting arrest, criminal damaging (4 times), jaywalking, receiving stolen property, theft, and grand theft of a motor vehicle. Ferguson's mother reported that he set fire to a bed when he was 3-4 years old. The psychologist's report noted that Ferguson had been provided "a wide array of intervention opportunities" through the juvenile court, yet Ferguson continued to incur charges and "engaged in a pattern of defiant and assaulting actions."

{¶ 34} The psychologist's report provided substantial details about Ferguson's family situation and his educational, substance abuse, and legal history. The psychologist stated that Ferguson had reported having serious anger problems since he was three years old. Ferguson has had four mental health/substance abuse assessments, the first of which occurred in August 2011. Ferguson had previously received intensive therapeutic services in a secured, structured environment due to delinquency adjudications. Nevertheless, Ferguson had made several statements which reflected "a reckless disregard for societal rules or authority, a blatant disrespect for the rights of others, and seemingly no concern for how his actions affect anyone." When asked what he had learned from his therapeutic experiences, Ferguson responded, "Nothing. I didn't care. I didn't listen. I didn't want to change and didn't care."

{¶ 35} Accordingly, we find that we are able to review the juvenile court's amenability determination in this case, and we turn to whether the juvenile court erred in transferring the felonious assault count to adult court. Again, in light of *Aalim II*, the juvenile court was required to transfer the murder charge to adult court under the mandatory transfer provisions.

{¶ 36} We have repeatedly interpreted R.C. 2152.12(I) to mandate the transfer of a discretionary-transfer offense when it is founded on the same course of conduct as another offense which must be transferred. *See State v. Brookshire*, 2d Dist. Montgomery No. 25853, 2014-Ohio-1971; *State v. Henderson*, 2d Dist. Montgomery No. 21866, 2007-Ohio-5368; *State v. Washington*, 2d Dist. Montgomery No. 20226, 2005-Ohio-6546, ¶ 25.

{¶ 37} In *Washington*, the juvenile-defendant was charged in juvenile court with carrying a concealed weapon and aggravated robbery involving use of a deadly weapon. The juvenile court determined that the aggravated robbery was a mandatory-bindover offense, and it transferred the case to adult court. Washington moved in the adult court to dismiss the CCW charge, arguing that the juvenile court acted improperly when it ordered him bound over on that charge. We rejected Washington's argument, reasoning:

None of the [mandatory bindover] provisions cited above apply to the CCW charge, which is a non-category offense. However, R.C. 2152.12(I) provides that when a "case" is transferred pursuant to division (A) of that section "[t]he transfer abates the jurisdiction of the juvenile court with respect to the delinquent acts alleged in the complaint, and, upon the

transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and the case then shall be within the jurisdiction of the court to which it is transferred as described in division (H) of section 2151.23 of the Revised Code." R.C. 2151.23(H) likewise terminates the jurisdiction of the juvenile division after a transfer is ordered.

There is no constitutional right to be tried as a juvenile. Rather, recognizing the value of treating juveniles differently, the General Assembly, acting pursuant to the authority conferred on it by Article IV, Section 4(B) of the Ohio Constitution to determine the jurisdiction of the court of common pleas and its divisions, has conferred exclusive jurisdiction over alleged juvenile offenders on the juvenile division of the court of common pleas. R.C. 2151.26. [sic] Statutory provisions creating exceptions to that jurisdiction through transfer to the general division, whether discretionary or mandatory, likewise represent an exercise of the General Assembly's power. R.C. 2[1]52.12(I), which mandates transfer of a "non-category" offense charge when it is founded on the same course of conduct as another offense which must be transferred, is such a jurisdictional provision. Its object is judicial economy; to prevent dual proceedings in the two divisions. Presumably, the General Assembly has found that the value of judicial economy in that regard outweighs any benefit that would otherwise accrue by treating the alleged offender as a juvenile.

Because the alleged aggravated robbery and CCW offenses underlying Defendant's two delinquency charges arose from a common

nucleus of operative facts, and the juvenile division having properly ordered proceedings on the aggravated robbery charge transferred to the general division pursuant to R.C. 2152.12(A)(1(b) [sic], all further proceedings in the juvenile division on the CCW charge in the "case" were thereafter discontinued per R.C. 2152.12(I) and the juvenile division's jurisdiction was terminated. The juvenile division court was then relieved of any requirement that R.C. 2152.12(F) otherwise imposes to conduct further hearings or to make findings with respect to Defendant's eligibility to be tried as a juvenile on the CCW offense before transferring proceedings on that charge to the general division. The juvenile division's bind-over order operated to confer exclusive jurisdiction to adjudicate those charges on the general division court.

*Washington* at ¶ 24-26.

{¶ 38} We have applied *Washington* on several occasions. In *Henderson*, we concluded, citing *Washington*, that the juvenile court's jurisdiction over two discretionary bindover charges (abduction and kidnapping) was terminated upon properly ordering that proceedings on the mandatory-bindover offenses (aggravated robbery and aggravated burglary) be transferred to the general division of the common pleas court pursuant to R.C. 2152.12(A)(1)(b). We further stated that, "because the juvenile court had appropriately transferred all further proceedings pertaining to the act charged, it was not required to make findings pursuant to [R.C.] 2152.12(B) as to whether Henderson was amenable to care or rehabilitation within the juvenile system, or whether the safety of the community required that he be subject to adult sanctions." *Henderson* at ¶ 14.

{¶ 39} More recently, in *Brookshire*, the defendant asked us to "revisit our interpretation and application of R.C. 2152.12(I) in *Washington* and *Henderson*." *Brookshire* at ¶ 16. We declined to do so, concluding that "we will continue to interpret R.C. 2152.12(I) to mandate the transfer of a discretionary transfer offense when it is founded on the same course of conduct as another offense which must be transferred." *Brookshire* at ¶ 21.

{¶ 40} This conclusion is consistent with the Ohio Supreme Court's recent opinion in *State v. D.B.*, Ohio Sup.Ct. Slip Opinion No. 2017-Ohio-6952, which noted that "*[c]ases* of juvenile defendants that fall into these [mandatory-transfer] categories are transferred out of the juvenile system without any judicial finding of the juvenile's amenability to care or rehabilitation within the juvenile system." (Emphasis added.) *D.B.* at ¶ 11.

{¶ 41} Here, once the trial court determined that it was required to transfer the murder charge to adult court pursuant to the mandatory bindover statutes, the juvenile court was required to transfer the felonious assault charge, which was founded on the same course of conduct as the murder charge. The juvenile court's jurisdiction over both charges terminated, and the juvenile court was not required to conduct an amenability hearing with respect to the felonious assault charge. Although the juvenile court, in fact, held an amenability hearing on the felonious assault charge, that hearing and the juvenile court's subsequent discretionary transfer order has no import.

{¶ 42} Even if we were to evaluate whether the juvenile court abused its discretion in finding that Ferguson was not amenable to treatment in the juvenile system, we would find no abuse of discretion.

{¶ 43} Before a discretionary transfer, the juvenile court must "order an

investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child." R.C. 2152.12(C). In determining whether a juvenile should be bound-over on a discretionary transfer charge, the juvenile court must consider the statutory factors (and any other relevant factors) in favor of and against transfer. R.C. 2152.12(B), (D), and (E).

{¶ 44} "[A]n amenability hearing is a broad assessment of individual circumstances and is inherently individualized and fact-based. Thus, a juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse-of-discretion standard." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 14.

{¶ 45} At Ferguson's amenability hearing, counsel for the State and Ferguson waived their right to present evidence concerning amenability, and the parties agreed that the juvenile court would make its determination solely on "the file the [juvenile court] has received, the updated DIR, as well as the psychological report presented to the [juvenile court]." In its oral findings, the juvenile court discussed the psychological report in detail, including the mental health and substance abuse assessments Ferguson has had and Ferguson's continued problem with drugs. The court further discussed the services Ferguson had previously received through the juvenile court, including probation and placement at CAS and JCARE. The juvenile court concluded that, "through all the services that have been supplied to [Ferguson], he simply didn't care and doesn't care, by his own words." The juvenile court found that Ferguson had shown no remorse for his actions toward Adams and that Ferguson had "decided that socially inappropriate

behaviors, such as hitting or choking other people," are acceptable ways to respond to problems. The juvenile court's written judgment entry made findings on each of the factors to be considered in R.C. 2152.12(D) and (E).

{¶ 46} On appeal, Ferguson argues that, in determining that he was not amenable to treatment in the juvenile system, the juvenile court did not consider why the array of available juvenile dispositions would not rehabilitate him or how he would fare in the criminal justice system. Ferguson emphasized that he had "nearly four years to be rehabilitated in the juvenile justice system," and that he could have received long-term, structured mental health programming at DYS. He further noted that, in adult prison, he would not receive any of the treatment that is available in the juvenile justice system and at DYS institutions, and that transferring him to adult prison would likely not increase public safety.

{¶ 47} The record reflects that, in considering whether Ferguson was amenable to care or rehabilitation in the juvenile system, the juvenile court considered Ferguson's "extensive disposition investigative report" and the services that Ferguson had previously received in the juvenile court. The DIR summary section indicated that, since being placed on probation in 2011, Ferguson "has been placed under the Court's supervision on five separate charges, has received a Violation of Court Order seven times and he received a Violation of EHM on four occasions. In regards to services, the youth has been in Detention eleven times, Corrections Once, EHMN six times, CAS on two occasions, and JCARE on two occasions. Additionally, this youth had three unsuccessful stints with LIFE and JCARE aftercare." The juvenile court spoke extensively about Ferguson's indifference to the services and treatment options available

to him, noting that Ferguson had come to accept his violent behavior as normal and that Ferguson had repeatedly stated that he "didn't care" and "didn't want to change" his behavior.

{¶ 48} Although the juvenile court did not expressly address why placement with the Department of Youth Services would be an inadequate sanction, it is clear that the juvenile court considered Ferguson's extensive history in the juvenile court, the circumstances of the current offense, Ferguson's attitude to the current offense and to rehabilitation, and Ferguson's maturity. The juvenile court did not indicate that it had considered how Ferguson would fare in the adult criminal system, but the juvenile court was not statutorily required to consider that factor, to the extent that it differs from consideration of whether Ferguson was emotionally, physically and psychologically mature enough for the transfer. Based on the record, the juvenile court reasonably concluded that there was not sufficient time to rehabilitate Ferguson within the juvenile system and that the level of security available in the juvenile system does not provide a reasonable assurance of public safety.

{¶ 49} Accordingly, even if we were to consider the issue, we would find no abuse of discretion in the juvenile court's finding, with respect to the felonious assault charge, that Ferguson was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions.

{¶ 50} Ferguson's fifth assignment of error is overruled.

### III. Motion to Suppress

{¶ 51} Ferguson's second assignment claims that the trial court "erred when it failed to suppress the statements made by Darryl Ferguson, as a result of officers illegally

arresting him."

{¶ 52} The State's evidence presented at the suppression hearing consisted of the testimony of five law enforcement officers – Detective Rod Roberts, Officers Mitch Olmsted and Edmond Trick, and Deputies Douglas Olt and Jerry Schwartz – and several exhibits. Ferguson testified on his own behalf. The trial court found the officers' testimony to be credible, and it found Ferguson's "self-serving testimony to be completely incredible insofar as it would contradict the testimony of the law enforcement officers." Based on the State's evidence, the trial court found the following facts.

{¶ 53} During the investigation into the assault on Adams, the Dayton Police Department received tips from two identified individuals, from Miami Valley Crime Stoppers, and from an anonymous telephone call placed to Officer Olmsted; each of the tips implicated Farrell and Ferguson. Specifically, the witnesses stated that Farrell and Ferguson had bragged about beating Adams.

{¶ 54} On or about June 10, 2014, Detective Roberts asked Officer Olmsted to locate Ferguson and Farrell, both of whom Olmsted knew from the neighborhood, and to bring them to the Safety Building to speak with him (Detective Roberts). At approximately 8:45 a.m., wearing the uniform of the day, Officer Olmsted drove his marked cruiser to Ferguson's address. En route, Olmsted asked for backup, and Officer Trick responded. When Olmsted knocked on the front door to Ferguson's home, the individual who answered told Olmsted that Ferguson was at his girlfriend's house, which was on the same street. The officers walked down the block to the girlfriend's house.

{¶ 55} At the girlfriend's house, an adult unknown to Officers Olmstead and Trick answered the door with a large dog. The officers indicated that they were looking for

Ferguson and asked the man if they could enter. The man answered affirmatively, restrained the dog, and directed the officers to a bedroom occupied by Ferguson and his girlfriend. Upon encountering Ferguson, the officers informed him that Detective Roberts wished to speak with him; Ferguson "freely and voluntarily consented to do so."

{¶ 56} Thereafter, the officers and Ferguson walked out of Ferguson's girlfriend's house and toward Ferguson's residence, where the officers' cruisers were parked. Ferguson was not handcuffed and was wearing a white t-shirt, basketball shorts, and sandals. As they walked together, Officer Olmsted asked Ferguson where Farrell was, and Ferguson replied at his (Ferguson's) house. The officers placed Ferguson in the rear of Trick's cruiser and, after locating Farrell, placed Farrell in the rear of Olmsted's cruiser. Ferguson and Farrell were separately transported, without handcuffs, to the Safety Building. The officers brought Ferguson and Farrell through the non-public entrance and placed in separate interview rooms.

{¶ 57} Detective Roberts interviewed Ferguson twice on June 10, 2015. At approximately 9:26 a.m., Detective Roberts, along with Detective Rebecca Rasor, began the first interview. Before asking questions, Detective Roberts obtained Ferguson's "identifiers" and explained to Ferguson that he was being interviewed regarding an allegation of felonious assault; Ferguson indicated that he had been *Mirandized* before. Roberts informed Ferguson of his *Miranda* rights using a pre-interview form, on which Ferguson "placed his initials next to each delineated right, reading the first right aloud, and signing the form at the bottom after agreeing to be interviewed." Ferguson indicated that he had completed ten years of schooling. Additionally, when Detective Roberts read aloud the Waiver of Rights section, Roberts asked Ferguson if he understood the term

"coercion", and when Defendant indicated that he did not, Roberts explained the meaning of the term.

{¶ 58} Ferguson subsequently made statements that implicated Farrell in the assault. At the conclusion of the interview, Ferguson consented to giving a DNA sample to Detective Roberts. Ferguson requested to use the restroom, and the detectives granted that request. The first interview ended at approximately 10:33 a.m.

{¶ 59} Ferguson was taken to a smaller interview room while Detective Roberts interviewed Farrell and further investigated the matter at the crime scene. While Ferguson waited in the interview room, Officer Trick checked in on Ferguson approximately every 20 minutes, asking him (Ferguson) if he needed food, water, or to use the restroom.

{¶ 60} Ferguson was again interviewed by Detective Roberts at approximately 2:59 p.m., approximately 4½ hours after the conclusion of the first interview. Roberts asked Ferguson if he remembered going over his *Miranda* rights prior to the first interview, and Ferguson responded affirmatively. Roberts also inquired as to whether Ferguson still understood his rights, and Ferguson responded that he did. Detective Roberts told Ferguson that he had further investigated the matter and had spoken with numerous individuals, including Farrell. Roberts told Ferguson that he believed Ferguson had been untruthful during his interview. Ferguson subsequently made incriminating statements. The second interview concluded at approximately 3:28 p.m.

{¶ 61} Detective Roberts asked Ferguson if he would provide a written statement, and Ferguson agreed. Detective Roberts and Detective Tom Cope, who also participated in the interview, left the room while Ferguson wrote his statement. After

Ferguson completed his written statement, he knocked on the door and Detective Roberts returned to the interview room. Roberts then asked three "yes or no" follow-up questions, which Roberts wrote below Ferguson's written statement; Ferguson responded yes to each question and initialed next to each response. Ferguson was arrested for felonious assault.

{¶ 62} The trial court also heard testimony about statements that Ferguson made on December 23, 2014, and January 15, 2015. On December 23, Deputy Schwartz, while providing security for the juvenile court, overheard a statement made by Ferguson to his father. On January 15, Deputy Olt conversed with Ferguson while walking Ferguson from the "juvenile jail" to the courthouse.

{¶ 63} Ferguson testified on his own behalf regarding the June 10 interviews. According to Ferguson, Officer Olmsted arrived at his girlfriend's residence at 6:30 a.m. and knocked on the door. Ferguson's girlfriend answered the door. Olmsted asked if he could speak with Ferguson, and Ferguson walked over. Olmsted then told Ferguson that he (Ferguson) had to go with him (Olmsted). Ferguson responded that he did not want to go with the officer, but Olmsted said that Ferguson had to. Ferguson acknowledged that he was not handcuffed and that Olmsted did not say that he (Ferguson) was under arrest. However, Olmsted had said that Ferguson had to go with him, and Ferguson was placed in the back of a cruiser. Ferguson testified that Detective Roberts treated him well and provided him food, water, and opportunities to use the restroom. Ferguson also stated that he gave his written statement voluntarily. As stated above, the trial court found Ferguson's testimony to be not credible to the extent that it conflicted with the officers' testimony.

{¶ 64} In its suppression ruling, the trial court found, as a matter of fact, that Detective Roberts never instructed Officer Olmsted to arrest Farrell or Ferguson and that Olmsted did not do so on the morning of June 10, 2014. The court further found, as a matter of fact, that Ferguson "freely and voluntary came with Offs. Olmstead [sic] and Trick to the Safety Building and that neither Defendant nor Mr. Farrell were told they were under arrest nor were they, despite the fact that DPD certainly had probable cause to arrest them based upon the state of DPD's ongoing investigation into the Adams' beating." Additionally, the court found, as a matter of fact, that Ferguson was not free to leave the Safety Building following his first interview with Detective Roberts.

{¶ 65} The trial court denied Ferguson's motion to suppress the June 10 statements. It concluded that Ferguson was not in custody when he was transported to the police department on the morning of June 10, 2014, and regardless, Ferguson was properly notified of his *Miranda* rights. The court further stated that those warnings were not stale for Ferguson's second interview. The court also found that Ferguson did not invoke his *Miranda* rights, and there was no evidence that Ferguson's statements were involuntary.

{¶ 66} The court further concluded that, even if Ferguson did not voluntarily accompany Officers Olmsted and Trick to the police department, the police had probable cause to arrest him. The court stated that, "pursuant to *New York v. Harris* and *State v. Cranford*, **preexisting** probable cause in this case provided DPD with a legitimate basis for Defendant's arrest and his statements after being properly *Mirandized* cannot be the fruit of the poisonous tree." (Emphasis in original.)

{¶ 67} The trial court overruled the motion to suppress the statements overheard

by Deputy Schwartz, as they were not the product of custodial interrogation. The court suppressed the statements to Deputy Olt "in an abundance of caution."

{¶ 68} On appeal, Ferguson argues that (1) he was placed under arrest when Officers Olmsted and Trick took him to the police station on the morning of June 10, 2014, (2) the officers did not have probable cause to arrest him, and (3) the attenuation doctrine does not apply. Ferguson does not argue that his *Miranda* rights were not properly provided, that he did not voluntarily waive his *Miranda* rights, or that his statements were involuntarily given. Rather, he asserts that, since he was unlawfully arrested on the morning of June 10, his subsequent statements should have been suppressed as fruit of the poisonous tree.

{¶ 69} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994*); State v. Curley*, 2d Dist. Montgomery No. 27104, 2016-Ohio-7624, ¶ 9. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id*.

{¶ 70} Whether Ferguson was under arrest when he was interviewed at the police station and whether he was in custody at that time for *Miranda* purposes are equivalent questions. "Custodial interrogation" means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom to the degree

associated with a formal arrest. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Engle*, 2d Dist. Montgomery No. 25226, 2013-Ohio-1818, ¶ 24. The inquiry whether a person is subject to custodial interrogation focuses upon how a reasonable person in the suspect's position would have understood the situation. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). We have considered factors, such as the location of the interview, whether the defendant was a suspect, whether the defendant's freedom to leave was restricted in any way, and whether there were threats or intimidation. *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 50 (2d Dist.), citing *State v. Estepp*, 2d Dist. Montgomery No. 16279, 1997 WL 736501, *4 (Nov. 26, 1997). The subjective views of the interviewing officer and the suspect are immaterial to the determination of whether a custodial interrogation was conducted. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Hatten* at ¶ 50.

{¶ 71} In this case, at 8:45 a.m., two officers went into a bedroom occupied by Ferguson and his girlfriend, and they told Ferguson that a detective wanted to talk with him. Officer Trick testified that he asked Ferguson if he (Ferguson) was willing to come downtown and that Ferguson had agreed. Based on the testimony of Olmsted and Trick, the trial court expressly found that Ferguson voluntarily agreed to go with the officers to the station. (The trial court also expressly rejected the suggestion that Ferguson was told that he did not have a choice.) The officers waited while Ferguson looked for shoes to wear. Ferguson was not handcuffed, nor was he told that he was under arrest. He walked down the block to the cruisers. No weapons were drawn, and no threats were made. Although Ferguson was transported to the police station in a cruiser and was

taken to an interview room through a non-public entry, the officers' conduct toward Ferguson was not the functional equivalent of placing Ferguson under arrest. *Contrast State v. Armstead*, 2015-Ohio-5010, 50 N.E.3d 1073 (2d Dist.) (affirming the suppression of statements made to the police after the defendant, based on a "suspect locator hit," was removed from a stopped vehicle, patted down, placed in a cruiser, and taken to the station, without probable cause).

{¶ 72} Although Ferguson was not under arrest when he was taken to the police station, the record demonstrates that he was detained by the police for a lengthy period of time between his first and second interview. After Detective Roberts terminated the first interview, he did not inform Ferguson that he (Ferguson) was free to leave. In fact, Roberts testified that he would not have permitted Ferguson to leave the premises. Rather, Roberts placed Ferguson in a smaller interview room while he (Roberts) spoke with Farrell and conducted additional investigation. The detective instructed Officer Trick to check on Ferguson periodically and to offer food and water. Ferguson remained in the interview room, alone, for 4½ hours.

{¶ 73} We question whether Ferguson voluntarily remained at the police station after his first interview. However, Ferguson has not specifically argued – either in the trial court or on appeal – that, after the first interview, he was unlawfully arrested or unlawfully held as part of an investigatory detention. Accordingly, we conclude that this argument has been waived, and we will not address it in the first instance.

{¶ 74} In light of our conclusion that Ferguson voluntarily came to the police station and was not under arrest, we need not address Ferguson's derivative arguments that the police officers lacked probable cause to arrest him and that the attenuation doctrine does

not apply.   Ferguson's second assignment of error is overruled.

### IV. Imposition of Maximum Sentence

{¶ 75} In his third assignment of error, Ferguson claims that the trial court erred when it sentenced him to the maximum sentence for a first-degree felony.

{¶ 76} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard.   *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9.   Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law.

{¶ 77} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences."   *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.).   However, in exercising its discretion, a trial court must consider the statutory criteria that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12.   *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 78} R.C. 2929.11 requires trial courts to be guided by the overriding purposes of felony sentencing.   Those purposes are "to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state

or local government resources." R.C. 2929.11(A). The court must "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* R.C. 2929.11(B) further provides that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

{¶ 79} R.C. 2929.12(B) sets forth nine factors indicating that an offender's conduct is more serious than conduct normally constituting the offense; R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense. R.C. 2929.12(D) and (E) each lists five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record.

{¶ 80} At sentencing, the trial court did not orally provide an explanation for its maximum sentence (and restitution). However, the trial court explicitly stated that it had considered the purposes and principles of sentencing "set forth in the Code, including avoiding unnecessary burden on government resources, the seriousness and recidivism factors of the Code, the dictates of 2929.13 and as otherwise set forth in the Revised Code including Mr. Ferguson's present and future ability to pay financial sanctions including any restitution." Upon review of the record, Ferguson's sentence was neither contrary to law nor clearly and convincingly unsupported by the record.

**{¶ 81}** Ferguson's third assignment of error is overruled.

## V. "Reverse" or "Return" Bindover

**{¶ 82}** Ferguson's fourth assignment of error claims that the trial court erred when it failed to sentence Ferguson in accordance with R.C. 2152.121.

**{¶ 83}** R.C. 2152.121(B) governs what the adult court must do once a juvenile who has been transferred from juvenile court pursuant to the mandatory transfer provisions has been found guilty of an offense in adult court. Under these provisions, the adult court must determine if the offense(s) of which the juvenile has been found guilty would have required mandatory transfer or discretionary transfer from the juvenile court to adult court. R.C. 2152.121(B)(1). "In other words, the trial court must determine what the juvenile court *would have been required to do with the case* if the juvenile had been charged with only those offenses for which convictions were obtained." (Emphasis in original.) *D.B.*, Ohio Sup.Ct. Slip Opinion No. 2017-Ohio-6952, ¶ 12. Three options are possible:

- If mandatory transfer would have been required for the case, the adult court proceeds to sentence the juvenile as usual. R.C. 2152.121(B)(4); *see D.B.* at ¶ 19.

- If mandatory transfer would not have been required and discretionary transfer would not have been allowed, the adult court must transfer jurisdiction of the case back to the juvenile court. R.C. 2152.121(B)(2).

- If the court determines that mandatory transfer would not have been required but that discretionary transfer would have been allowed, the adult court must "determine the sentence it believes should be imposed upon the child under Chapter 2929. of the Revised Code, shall impose that sentence upon the child,

and shall stay that sentence pending completion of the procedures specified in this division. Upon imposition and staying of the sentence, the court shall transfer jurisdiction of the case back to the juvenile court that initially transferred the case and the juvenile court shall proceed in accordance with this division." R.C. 2152.121(B)(3).

{¶ 84} Upon transfer back to the juvenile court pursuant to R.C. 2152.121(B)(3), the juvenile court is required to impose a serious youthful offender dispositional sentence. R.C. 2152.121(B)(3)(a). However, within 14 days of the transfer, the prosecuting attorney may file a motion objecting to the imposition of such a sentence and asking for the adult sentence to be invoked. R.C. 2152.121(B)(3)(b). If such a motion is filed, the juvenile court must conduct an amenability hearing. *Id.* If the juvenile court grants the prosecutor's motion, the juvenile court must transfer jurisdiction of the case back to the adult court in which the juvenile was convicted, and the sentence that was imposed but stayed by the adult court will be invoked. *Id.*

{¶ 85} On appeal, Ferguson contends that the trial court was required to stay his sentence for voluntary manslaughter and transfer the case back to juvenile court, pursuant to R.C. 2152.121(B)(3). He argues:

> In this case, voluntary manslaughter is not a mandatory transfer offense because Darryl was not alleged to have used a firearm and Darryl had not previously been committed to the Department of Youth Services; therefore, Darryl was only eligible for discretionary transfer for that offense. Compare R.C. 2152.10(A)(2) with R.C. 2152.10(B). As such, R.C. 2152.121(B)(3) was triggered, and the criminal court was required to stay

Darryl's sentence, and return his case to the juvenile court to receive a SYO disposition or an amenability hearing. R.C. 2152.121(B)(3)(a)-(b). But, the proceedings required by R.C. 2152.121 did not occur in this case.

At the sentencing hearing, the State argued that the reverse waiver statute was not triggered because the juvenile court conducted an amenability hearing on the felonious assault charge. * * * But, as this Court noted in 2014,

> the fact that the juvenile court properly transferred the cases to adult court does not end our analysis. Whether all of the charges were properly transferred from the juvenile court to the adult court is a different question than whether the adult court could subsequently impose sentences on all six of the offenses. R.C. 2152.121(B) governs what the adult court must do once a juvenile has been found guilty of an offense in adult court that previously was transferred from juvenile court.

*State v. Brookshire*, 2d Dist. Montgomery No. 25859, 2014-Ohio-4858, ¶ 18. In that case, this Court held that because some of the child's offenses were not subject to mandatory transfer, the sentencing court must comply with R.C. 2152.121. *Brookshire* at ¶ 20.

**{¶ 86}** The State responds that *Brookshire* is distinguishable, because the youth in *Brookshire* was transferred to adult court under the mandatory transfer provisions, and no amenability hearing was conducted in the juvenile court. The State argues that,

because "the juvenile court had already determined Ferguson was not amenable to treatment and supervision in the juvenile system, the reverse bindover provision in the Revised Code did not apply in this case."

{¶ 87} Our opinion in *Brookshire*, 2d Dist. Montgomery No. 25859, 2014-Ohio-4858, concerned whether the adult court erred in sentencing Brookshire on both the mandatory bindover offenses and the discretionary bindover offenses to which he had pled guilty. We held that R.C. 2152.121 required the adult court to transfer the discretionary-transfer offenses back to juvenile court. *Id.* at ¶ 28, as amended by *State v. Brookshire*, 2d Dist. Montgomery No. 25859, 2014-Ohio-5368.

{¶ 88} The Ohio Supreme Court recently reversed our judgment in *Brookshire*. *See D.B., supra.* It held that the adult court was required to sentence the juvenile "for all the convictions in the case" if the juvenile were convicted of at least one offense that was subject to mandatory transfer. *D.B.* at ¶ 19. The Supreme Court reasoned that R.C. 2152.121(B) governs how a juvenile's case, not the individual offenses, should be treated by the adult court for sentencing.

{¶ 89} The issues raised in *Brookshire* have little relevance to this case, given Ferguson was not found guilty of both mandatory transfer and discretionary transfer offenses. Accordingly, even if *Brookshire* had not been reversed, we would find it inapposite.

{¶ 90} We nevertheless find the State's arguments unpersuasive for two reasons. First, the procedures set forth in R.C. 2152.121 are clear and unambiguous, and the adult court does not have the discretion to ignore its mandates. Pursuant to the mandatory bindover provisions, Ferguson was bound over to the General Division (adult court) on

the murder charge, and he was convicted of voluntary manslaughter. Voluntary manslaughter is a Category Two offense, as defined by former R.C. 2152.02 (CC)(1) (now R.C. 2152.02(BB)(1)), and under R.C. 2152.10(A)(2), a child charged with a Category Two offense (other than kidnapping) is subject to mandatory transfer only if the child was 16 years old or older at the time of the offense and either

(a) The child previously was adjudicated a delinquent child for committing an act that is a category one or a category two offense and was committed to the legal custody of the department of youth services on the basis of that adjudication[, and/or]

(b) The child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate the commission of the act charged.

{¶ 91} Ferguson did not meet all of the necessary criteria under R.C. 2152.10(A)(2), and therefore voluntary manslaughter was not a mandatory bindover offense for Ferguson. However, pursuant to R.C. 2152.10(B), Ferguson was eligible for discretionary transfer for the offense. Accordingly, pursuant to R.C. 2152.121, the trial court was required to impose a sentence for voluntary manslaughter, stay the sentence, and transfer the matter back to the juvenile court for proceedings in accordance with R.C. 2152.121(B)(3).

{¶ 92} Second, we reject the State's argument that a "reverse bindover" was not required, because the juvenile court had already conducted an amenability hearing with respect to the felonious assault charge and, in the exercise of its discretion, had

determined that Ferguson was not amenable to care or rehabilitation within the juvenile system or that the safety of the community required that he be subject solely to adult sanctions. As stated above, because the juvenile court was required to transfer Ferguson under the mandatory transfer provisions, the amenability hearing had no legal import.

{¶ 93} Moreover, the juvenile court's amenability hearing was held in October 2014; Ferguson was sentenced in February 2016. Although we infer from the State's brief that it would choose to file a motion for invocation of the adult sentence if the matter were remanded to the juvenile court, it is possible that the State's opinion of Ferguson could have changed in the intervening sixteen months since his amenability hearing and that it would elect not to file a motion under R.C. 2152.121(B)(3)(b).

{¶ 94} Similarly, it is possible that, with sixteen additional months of maturity and experience, a second amenability hearing might include additional information that could alter the juvenile court's determination of Ferguson's amenability to care or rehabilitation in the juvenile system or on his dangerousness to the community. At sentencing, Ferguson's counsel stated: "[W]hen I met Darryl, he was – it was about two years ago. He was an immature little guy. But in the time that he's spent in the Juvenile Court he has grown and he has matured to some degree. I think hi[s] being with the supervision in the Juvenile Court, I think he's learned a lot from the adults there, from the staff. And I think he's matured. And I think you'll see that that [sic] he has grown, matured, and he is remorseful for what he's done." Ferguson made similar statements at his sentencing:

I would like to say I'm sorry for my actions. I would like to ask if Mr. Adams'

family will forgive me for what I did and the pain that I caused for I know

what I did was wrong and nobody deserved to lose their life over some words that can't hurt you. Before I got locked up I was very immature and now I feel like I have matured a lot. I got a different perspective on life. Before I didn't care about life and now I realize that, in a matter of minutes, I could be facing a long time over a bad choice. I would like to thank you for allowing me to speak today in court. I would like to ask one more time that Mr. Adams' family will forgive me for my actions for I know what I did was wrong.

**{¶ 95}** We recognize that the adult court's presentence investigation report indicates that Ferguson admitted to being in at least five physical altercations while being held in detention while this case was pending. The last altercation was over Ferguson's not being passed a ball in a game of kickball. This information would also be available for the juvenile court to consider in an amenability hearing pursuant to R.C. 2152.121.

**{¶ 96}** Ferguson's fourth assignment of error is sustained.

### VI. Imposition of Mandatory Sentence – *State v. Hand*

**{¶ 97}** In his first assignment of error, Ferguson claims that the trial court erred in imposing a mandatory prison term, based on his prior juvenile adjudication. Specifically, Ferguson states that the trial court erroneously used Ferguson's prior juvenile adjudication for felonious assault, a second-degree felony, as a prior conviction and made Ferguson's sentence mandatory, pursuant to R.C. 2901.08(A) and R.C. 2929.13(F)(6). Ferguson asks that his sentence be vacated and the matter be remanded for resentencing.

**{¶ 98}** R.C. 2929.13(F)(6) requires a mandatory sentence for a first or second

degree felony if the offender had been previously convicted of or pleaded guilty to any first or second degree felony.   R.C. 2901.08(A) reads:

> If a person is alleged to have committed an offense and if the person previously has been adjudicated a delinquent child * * * for a violation of a law or ordinance, except as provided in division (B) of this section, the adjudication as a delinquent child * * * is a conviction for a violation of the law or ordinance for purposes of determining the offense with which the person should be charged and, if the person is convicted of or pleads guilty to an offense, the sentence to be imposed upon the person relative to the conviction or guilty plea.

{¶ 99} In *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, the Ohio Supreme Court held that "R.C. 2901.08(A) violates the Due Process Clauses of Article I, Section 16 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution because it is fundamentally unfair to treat a juvenile adjudication as a previous conviction that enhances either the degree of or the sentence for a subsequent offense committed as an adult."   *Id.* at paragraph one of the syllabus.   Hand further held that, "[b]ecause a juvenile adjudication is not established through a procedure that provides the right to a jury trial, it cannot be used to increase a sentence beyond a statutory maximum or mandatory minimum."   *Id.* at paragraph two of the syllabus.

{¶ 100} The State agrees that *Hand* has the effect of changing Ferguson's mandatory sentence for voluntary manslaughter into a non-mandatory term.   However, it argues that, because *Hand* does not change the length of the prison term, there is no reason for the matter to be remanded to the trial court for resentencing.   It argues that

the proper remedy is for this Court to modify Ferguson's sentence and to order the trial court to issue an amended termination entry removing the language that makes Ferguson's prison term mandatory.

{¶ 101} Especially in light our disposition of Ferguson's fourth assignment of error concerning R.C. 2152.121, the appropriate resolution is to reverse Ferguson's sentence and remand to the adult trial court for resentencing. At that time, the trial court may reconsider the length of Ferguson's sentence prior to staying its sentence and remanding the matter back to the juvenile court. Nothing in this Opinion prevents the trial court from imposing the same prison term as a non-mandatory term.

## VII. Conclusion

{¶ 102} In light of our disposition of Ferguson's first and fourth assignments of error, Ferguson's sentence will be reversed, and the matter will be remanded to the trial court for resentencing and compliance with R.C. 2152.121.

. . . . . . . . . . .

DONOVAN, J., concurs.

HALL, P.J., concurring in judgment only.

Copies mailed to:

Lynne R. Nothstine
Francisco E. Luttecke
Charlyn Bohland
Hon. Steven K. Dankof
Hon. Anthony Capizzi